## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREDERICK W.  POTETZ, | ) | CIVIL ACTION NO. |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | |
| | ) | |
| AURORA INNOVATION, INC., | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

### I.  PRELIMINARY STATEMENT

By this action, Plaintiff, Frederick W. Potetz, seeks wage loss, compensatory and punitive damages, costs and attorneys' fees because Defendant, Aurora Innovation, Inc., failed to accommodate him for his disability and terminated him because of his disability, in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12112.  Plaintiff also seeks the same remedies as a result of Defendant terminating him in retaliation for his complaint of disability discrimination, in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12203.  Finally, Plaintiff seeks wage loss, compensatory damages, costs and attorneys' fees for Defendant's parallel violations of the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq.

### II.  JURISDICTION

1.      This Court has jurisdiction of this matter by virtue of 28 U.S.C. § 1331, in that this is a civil action wherein the matter in controversy arises under the laws of the United States.

2.    This Court also has jurisdiction of this matter under 28 U.S.C. § 1367, in that this is a civil action of which this federal district court has original jurisdiction, and certain of Plaintiff's claims are brought under Pennsylvania state law, which are related to the federal claim in this action in that they form part of the same case or controversy under Article III of the Constitution of the United States.

3.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b), in that this is a civil action in which jurisdiction is not founded solely on diversity of citizenship, and the acts constituting a substantial part of the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

4.    On February 28, 2019, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the Defendant, alleging a failure to accommodate, disability discrimination and retaliation.  Plaintiff's Charge was dual filed with the Pennsylvania Human Relations Commission ("PHRC").  On August 20, 2019, the EEOC issued Plaintiff a right to sue letter.

5.    Previously, about one month after he was terminated, on September 26, 2018, Potetz created an online portal account with the EEOC and completed and submitted an Inquiry form.  In the Inquiry, Potetz set forth the nature of his disability, the reason and basis for his disability discrimination and retaliation claims, that the Respondent was Defendant, and specifics about how Respondent failed to accommodate his disability.  This completed Inquiry Information form is attached as Exhibit 1.

6.    On September 28, 2018, Potetz received an email from the EEOC, reminding him to schedule an interview.  On the same date, Potetz scheduled an interview for the end of December, 2018, which was the soonest interview available.

7.      After September 28, 2018, Potetz repeatedly checked the portal for earlier openings for an interview appointment and also called the EEOC every few days between September 28, 2018 and October 7, 2018 to see if a sooner interview could be arranged.  These efforts were unsuccessful.

8.      On October 8, 2018, Potetz called the EEOC and spoke to a female employee.  He again requested an earlier interview, but was told none was available.  He asked about a walk-in appointment, but was told by the employee that the EEOC wasn't accepting walk-in appointments because of a back log of appointments.  Potetz again asked if there was any way to expedite the process and get a charge filed, the employee told him no, and that there was no other way to file a charge other than filing an inquiry and speaking with an agent first.  He then asked the employee if his filing would be late, and she responded it wouldn't be late and that "this was the process."

9.      On December 21, 2018, Juanita Barber from the EEOC telephoned Potetz and told him that his interview scheduled for late December (Potetz does not remember the exact date) had been rescheduled to February 27, 2019.  Potetz was told by Barber that the reason his interview needed to be rescheduled was because of the impending government shutdown.

10.     From December 22, 2018 through January 25, 2019, the United States government shut down.  The EEOC was included among the agencies that shut down within the government.

11.     The EEOC conducted Potetz's interview on February 27, 2019.  The next day, February 28, 2019, Potetz signed a Charge of Discrimination drafted by the EEOC on the basis of the information he gave to the agent.

### III.   PARTIES

12.     Plaintiff is Frederick W. Potetz, an adult individual who resides at 4266 Glen Lytle Road, Pittsburgh, Pennsylvania 15217.

13.     Defendant is Aurora Innovation, Inc (hereinafter "Aurora").  Defendant's corporate headquarters are located at 429 Acacia Avenue Palo Alto, CA 94306.  Defendant's Pittsburgh location, where Plaintiff worked, is located at 113 47th Street, Pittsburgh, PA 15201. Defendant is a company centered around research, development and implementation of self-driving technology.

### IV.   STATEMENT OF CLAIM

14.     Potetz worked for Aurora from March 19, 2018 through August 23, 2018 in the capacity of IT User Support Lead.  As one of his first tasks, he was asked by the IT Manager for the company to build out the IT operations of the Pittsburgh office.  Basically, that entailed handling all IT related planning, installation and support to bring the new Pittsburgh office online.

15.     Prior to being hired by Aurora, Potetz worked for Google for 8 years in IT operations.  Google hired Potetz to build out the IT operations in Google's Bakery Square office. In terms of IT operations, Potetz supported the entire Google staff at Bakery Square, which grew from approximately 80 to approximately 800 employees during Potetz's tenure.

16.     Potetz quit Google to accept Defendant's offer to join its team because it involved more interesting work, likely more valuable stock options and a higher upside in terms of growing with an up-and-coming, highly regarded and cutting-edge technology company.

17.     To entice Potetz to accept its offer of employment, the Head of Talent Acquisition of Aurora, Mindie Cohen, told Potetz that the 11,000 shares he would receive over a 4-year vesting schedule of stock options would be worth anywhere from two to four million dollars when Aurora's IPO was launched.  Additionally, in response to a question by Potetz about whether the company had a retirement plan, she responded that he would not need one due to the expected future value of the stock.

18.     During the hiring process, Potetz told several of the people who interviewed him that he is disabled and suffers from the effects of severe sleep apnea, occasional migraines, and a persistent Achilles injury across both tendons. Potetz mentioned that he had been out on disability for the sleep apnea symptoms, but was doing much better since being placed on an effective treatment.  He did not provide details of the disorder at this time, and the company did not ask for any.  But, he did ask Defendant whether it had any concern with his disability, and all the interviewers said no.

19.     When he started working for Aurora, Potetz told Kevin Moore, his boss and the IT Manager of the company, that he has severe obstructed sleep apnea, which, when untreated, causes him the following problems: hypoxia (a lack of oxygen to the brain), memory loss, problems with concentrating for long periods, migraine headaches, low blood oxygen levels causing muscle fatigue, difficulty speaking and remaining awake, panic and anxiety attacks, high blood pressure and an increased risk of a heart attack or stroke.  He also told Moore that he had chronic weakness in his Achilles' tendons, which caused him to walk with a limp.  Potetz explained to Moore that when his sleep apnea went untreated, the symptoms he suffered affected almost every aspect of his day-to-day life.

20.     Potetz also explained to Moore during the same meeting that, at that time, he was being successfully treated for his sleep apnea through use of a dental device while he slept, but that occasionally, he still had difficulty waking up, headaches, daytime sleepiness and muscle fatigue.  As a result, Potetz asked Moore for an accommodation in the form of sometimes needing to sleep on company property during his lunch break.  Moore granted Potetz's request. Potetz also mentioned that he may need to come into the office a bit later occasionally due to the aforementioned symptoms.  Moore replied that it was not an issue because the company offers unlimited sick time.

21.     When his medical condition was treated, Potetz was able to perform all of the essential functions of his job with Defendant, subject to the few minor accommodations as noted above.

22.     Previously, for approximately 1.5 years in 2016 and 2017, Potetz was out of work on long-term disability for his sleep apnea condition.  In 2017, his doctors were able to put his condition mostly in remission by creating a special dental appliance that unblocked the obstruction that caused the sleep apnea and improved Potetz's breathing.

23.     During Potetz's first week, Moore spoke glowingly about Potetz, saying that finding him was like finding a unicorn in Pittsburgh.

24.     About one week after Potetz began his employment, he was involved in an automobile accident.  He was diagnosed with a mild concussion and took two days off of work.

25.     Over the next several months, Potetz's performance was excellent.  The VP of Engineering at the time, Suzanne Liu, sent Potetz a thank you note and a gift card for "making the move to the TechForge office so smooth." In a short amount of time, Potetz already had completed a majority of the build-out of the TechForge office.

26.     Early on the morning of June 28, 2018, the dental device that Potetz used to treat his sleep apnea shattered while he was sleeping around 4:00 a.m.

27.     The same morning, on June 28, 2019, Potetz promptly spoke to the office of the sleep apnea dentist who manufactured the device, Dr. Nicole Chenet, and was told it would take 4-6 weeks to repair the device.  Potetz also was told in the same conversation that it would be a month before he could get an appointment with the dentist to potentially get a temporary mouthpiece made, but they would send in the original device for repair immediately. Potetz mailed the device to his apnea dentist for repair on June 29, 2019.

28.     On either June 28 or 29, 2018 Potetz met with Erin South, Defendant's new head of HR in the Pittsburgh office, during which he explained the details of his disability and let her know that his mouthpiece was broken.  He also explained that without his dental appliance, his symptoms would become increasingly severe. He told South that he would make an appointment with his sleep doctor as soon as possible for recommendation, but that, based on past conversations, the doctor likely would recommend that he not work during this time.

29.     South replied that she would need a doctor's recommendation in order to approve any medical leave, but that she would talk to her boss, since Potetz was the first person at Aurora to have a disability and she wanted to make sure the company handled it correctly.

30.     Potetz attempted to comply with South's request, but, unfortunately, he had to wait two weeks to see his sleep doctor, Dr. Khalid Malik, because he was on vacation for the next two weeks and his office was closed.

31.     On either June 29, 2018 or July 2, 2018, Potetz explained to South that he was not able to see his doctor (or any other doctor in that office) for two weeks, that his work without a doubt would be impacted due to the symptoms (described above) which he gets when his

hypoxia is untreated.  Potetz stressed that some of the symptoms of his hypoxia were uncontrollably falling asleep during the day, memory loss, difficulty concentrating, difficulty speaking, difficulty breathing, and progressing to increased potential for heart attack or stroke. Potetz concluded that he needed to be off work until he got his appliance back and was able to recover.

32.     South reiterated that she would need to hear from Potetz's doctor before the company could grant his request for leave.  Potetz asked whether a note or call from his dentist or primary care physician would suffice, and South answered no, it needed to be from his sleep doctor.

33.     As a result of Defendant's denial of his request for leave, Potetz had no choice but to remain at work for approximately three weeks until he was able to see his doctor.  During those three weeks, while at work, Potetz fell asleep and also suffered from headaches, exhaustion, daytime sleepiness, muscle fatigue, trouble waking up, difficulty concentrating and speech problems.  Accordingly, as he had told South previously, his work suffered during this period of time while his hypoxia went untreated.

34.     On July 12, 2018, Moore issued Potetz a written performance warning, basically stating that Potetz was not working hard enough.   As part of this warning, Moore required Potetz to work 9:00 a.m. to 6:00 p.m. every day moving forward, even though previously he had told Potetz that he had no set work hours and everyone came and went as they saw fit.  Moore also required Potetz to track in the Defendant's system any time off due to sickness.

35.     No other employee in the Pittsburgh office was required to work 9:00 a.m. to 6:00 p.m.  Nor did any other non-disabled employee in the Pittsburgh office have a requirement to track sick time in Defendant's system.

36.     On approximately July 16 or 17, 2018, Potetz had a video conference with William Mouat, the company's General Counsel and Vice President.  Potetz told him what was happening and explained his medical condition and his request for time off which had been denied up until that point.  Potetz also told Mouat that he thought that Moore imposing additional requirements on Potetz (see paragraph 34 above) following Potetz's disclosure of his disability was a violation of the ADA.

37.     On July 19, 2018, Potetz received verbal instruction from Rachel Falsone, CRNP at Dr. Malik's office, that he should not work for approximately two to four weeks while he is without the sleep apnea dental appliance.  Specifically, Falsone said "let me know what you need for your HR because you are at risk for a heart attack or stroke if you continue to work."

38.     On July 20, 2018, Potetz went to South and let her know that his doctor stated that he should not be working for that reason and asked what paperwork does Aurora need to make that happen. South responded by asking Potetz to have his doctor complete a four-page document titled "Disability Certification of Health Care Provider", which requested, among other things, details on the effects of Potetz's hypoxia any limits on the essential functions of his job.

39.     On July 23, 2018, Potetz had a severe asthma-like breathing episode.  He alerted South that he was leaving work and he went to Urgent Care.

40.     On July 26, 2018, Potetz received the completed forms from the Sleep Clinic detailing both treated and untreated effects of his hypoxia and other sleep apnea side effects on his work.  On that same date, he gave these completed forms to South.  South then told Potetz that in order for him to be off from work, he needed to obtain a note from his doctor stating that he was unable to work and for how long.

41.     On the same date, Potetz then updated Moore regarding his condition and the completed forms.  Moore asked Potetz "If working is a risk to your life, why are you here?"  Potetz responded, "Because you wouldn't let me leave without paperwork and my doctor couldn't give me an appointment until now."  Moore told Potetz to go home and take sick time until his paperwork came through.  Potetz went home.

42.     On July 30, 2018, Potetz picked up a letter from Rachel Falsone, CRNP, to Erin South, dated July 27, 2018, in which Falsone stated that Potetz suffered from obstructive sleep apnea, that this condition makes him extremely sleepy and unable to function during the day and at work, and requested that Potetz not work for the next two weeks while his oral appliance was being repaired.

43.     On that same date, Potetz emailed Moore and South the letter from Falsone and stated he would like his medical leave to begin instantly.

44.     On August 1, 2018, South granted Potetz's request for a two-week leave, back-dated to July 27 and ending August 9, 2018.

45.     On August 7, 2018, Potetz received his repaired dental appliance.  On the same date, Potetz's doctor, Dr. Chenet, asked him to request a one-day extension of his leave so that Potetz could have the weekend to get used to the new medical device that had been created for his sleep apnea.  He did so on August 8, and South granted Potetz's request, reminding him to be at the office by 9:00 a.m. on Monday morning.

46.     Potetz returned to work on Monday August 13, 2018.  When back, he found that all of his accounts had been closed and he had been removed from all company groups.  He spoke with South regarding disability accommodations (30-minute nap in the afternoon as needed to help with exhaustion, occasional late days due to headaches, and expectation of doctor

visits), which all were approved.  He reaffirmed his dedication to the company by asserting it still was his intent to do whatever was needed to meet the needs of the company.

47.     On August 21, 2018, Potetz attended a team meeting run by Moore, who told Potetz that the work he had been doing over the past week was good.

48.     On August 22, 2018, Moore asked Potetz for on a one-on-one meeting via video conference.  During that meeting, Potetz told Moore he was feeling better and glad to be back to work.  Moore asked toward the beginning of the meeting how he was doing.  Potetz replied with an analogy, comparing his recovery rate to the process of refilling a swimming pool with a garden hose.  Specifically, he responded it was "like refilling a pool with a garden hose, slow going, but definitely improving."  At the end of the discussion, Moore stated, **"You should know that as long as you are 'refilling the pool,' there is no room for you on this team."**  As the video-conference ended, Potetz was shocked.

49.     Following this call, Potetz had a brief meeting with South.  He told her about the comment Moore had just made to him and his concern about his job implications.  Potetz stated that Moore had been very upbeat about Potetz in recent meetings, notwithstanding that comment.  However, South stated that Moore had spoken to her earlier and reported that his performance was not where he wanted it to be, but had not given specifics outside of "leadership".  She also mentioned working 9:00 a.m. to 6:00 p.m., stating "it's in the job description."

50.     The very next day, August 23, 2018, Defendant terminated Potetz.  Potetz asked South whether there was any reason for the termination.  South responded he was terminated without cause.  Potetz repeated the question and South repeated the same answer.  Potetz was then escorted out of the building.

51.     Upon information and belief, Defendant replaced him with a non-disabled employee.

52.     As a result of Defendant's aforementioned conduct, Plaintiff has suffered a loss of past and future wages and benefits, substantial mental anguish, and emotional distress.  The termination caused Potetz to be depressed, and feel terrible both physically, emotionally financially.  Plaintiff also lost confidence as a result of the termination.

## V.     CLAIMS FOR RELIEF

## COUNT I – VIOLATION OF ADA – TERMINATION

44.     Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

45.     Defendant has intentionally and willfully engaged in a series of unlawful acts, practices, policies, and/or procedures in discriminating against Plaintiff with respect to compensation, terms, conditions, or privileges of employment in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12112.

46.     Defendant's decision to terminate Plaintiff was induced by its intent to discriminate against Plaintiff on the basis of his disability as evidenced, among other things, Aurora's actions following Plaintiff's disclosure of his disability and reasonable accommodation requests, including Moore's comments to Potetz, referenced above, that indicated his bias against individuals with disabilities, and terminating Potetz shortly after return from leave necessitated by his disability.

47.     Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

## COUNT II – VIOLATION OF ADA – RETALIATION

48.     Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

49.     Defendant intentionally retaliated against Plaintiff because of his continued reasonable accommodation requests and good faith complaint of disability discrimination, in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12203.

50.     Defendant's decision to terminate Plaintiff was induced by its intent to retaliate against Plaintiff, as evidenced by, among other things, Moore's actions following Plaintiff's complaint to HR about Defendant imposing additional requirements on him solely because of his disability and requests for a reasonable accommodation.

51.     Plaintiff has been directly harmed as a result of these violations as is fully set forth above.

## COUNT III – VIOLATION OF ADA – FAILURE TO ACCOMMODATE

52.     Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

53.     Defendant failed to accommodate Plaintiff's disability in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12112.

54.     As set forth above, Plaintiff is an individual with a disability because he suffers from an impairment that substantially limits one or more major life activities.

55.     Plaintiff informed Defendant of that disability and on several occasions requested a reasonable accommodation in the form of time off for a short time period.

56.     Defendant failed to engage in the interactive process and failed to accommodate Plaintiff's disability, despite the availability of reasonable accommodations for Plaintiff's disability.

57.     Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

## COUNT IV – VIOLATION OF PHRA – TERMINATION

58.     Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

59.     Defendant has intentionally and willfully engaged in a series of unlawful acts, practices, policies, and/or procedures in discriminating against Plaintiff with respect to compensation, terms, conditions, or privileges of employment in violation of the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq.

60.     Defendant's decision to terminate Plaintiff was induced by its intent to discriminate against Plaintiff on the basis of his disability as evidenced, among other things, Aurora's actions following Plaintiff's disclosure of his disability and reasonable accommodation requests, including Moore's comments to Potetz, referenced above, that indicated his bias against individuals with disabilities, and terminating Potetz shortly after return from leave necessitated by his disability.

61.     Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

## COUNT V – VIOLATION OF PHRA – RETALIATION

62.     Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

63.     Defendant intentionally retaliated against Plaintiff because of his continued reasonable accommodation requests and good faith complaint of disability discrimination, in violation of the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq.

64.     Defendant's decision to terminate Plaintiff was induced by its intent to retaliate against Plaintiff, as evidenced by, among other things, Moore's actions following Plaintiff's complaint to HR about Defendant imposing additional requirements on him solely because of his disability and requests for a reasonable accommodation.

65.     Plaintiff has been directly harmed as a result of these violations as is fully set forth above.


## COUNT VI – VIOLATION OF PHRA – FAILURE TO ACCOMMODATE

66.     Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

67.     Defendant failed to accommodate Plaintiff's disability in violation of the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq.

68.     As set forth above, Plaintiff is an individual with a disability because he suffers from an impairment that substantially limits one or more major life activities.

69.     Plaintiff informed Defendant of that disability and on several occasions requested a reasonable accommodation in the form of time off for a short time period.

70.     Defendant failed to engage in the interactive process and failed to accommodate Plaintiff's disability, despite the availability of reasonable accommodations for Plaintiff's disability.

71.     Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Honorable Court will:

(a)     Assume jurisdiction herein;

(b)     Declare Defendant's conduct to be unlawful and an intentional violation of Plaintiff's rights;

(c)     Award Plaintiff wage loss damages, including back pay, front pay, and lost future earnings, damages associated with the increased tax burden of any award, and lost fringe and other benefits of employment, including health, dental, and vision benefits;

(d)     Award Plaintiff damages for the value of his stock options.

(e)     Award Plaintiff compensatory damages under the ADA and PHRA;

(f)     Award Plaintiff punitive damages under the ADA;

(g)     Award Plaintiff pre and post-judgment interest;

(h)     Award Plaintiff costs and attorneys' fees under all counts; and

(i)     Grant such other relief as the Court deems just and appropriate.

Respectfully Submitted,

**JURY TRIAL DEMANDED**

<u>s/ David B. Spear</u>
David B. Spear
PA ID # 62133

Minto Law Group, LLC
Two Gateway Center
603 Stanwix Street, Suite 2025
Pittsburgh, PA 15222
412-201-5525
Fax: 412-201-5526
dspear@mintolaw.com

Attorney for Plaintiff